# UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

JOHN LENOX,                   :
    **Plaintiff**              :
                           :      **CIVIL ACTION NO.**
    **v.**                     :      **3:08cv01448 (DJS)**
                           :
**TOWN OF NORTH BRANFORD, FRANCIS** :
**MEROLA, MARK BARRETT, BRYAN**   :
**AUGUR, and DAVID NEUBIG,**       :
    **Defendants**           :

## MEMORANDUM OF DECISION

The Plaintiff, John Lenox, brings this action against the Defendants, Town of North
Branford ("the Town"), Francis Merola ("Merola"), Mark Barrett ("Barrett"), Bryan Augur
("Augur"),[1] and David Neubig ("Neubig") (collectively "the Defendants"). The Plaintiff seeks
injunctive relief against Merola, Barrett, Augur, and Neubig in their official capacities for his
claims premised upon the Federal Constitution. The Plaintiff seeks damages against Merola,
Barrett, Augur, and Neubig in their individual capacities for all claims.  The Plaintiff's Amended
Complaint alleges that (1) the Town and Merola retaliated against him for having exercised his
rights under the First Amendment to the United States Constitution as enforced through 42
U.S.C. § 1983, (2) Barrett, Augur, and Neubig violated his due process rights under the
Fourteenth Amendment to the United States Constitution as enforced through 42 U.S.C. § 1983,
(3) the Town violated Connecticut General Statutes § 31-51q by disciplining him for exercising
his rights under the First Amendment to the United States Constitution, and (4) the Defendants
intentionally inflicted emotional distress upon him.[2]  (Doc. # 54.) Barrett, Augur, and Neubig

---

[1] The Plaintiff's Amended Complaint spells Augur's first name "Brian." The Union Seniority List and Augur's
deposition spell the name "Bryan."
[2] In his Amended Complaint, the Plaintiff also alleges that (1) Barrett, Augur, and Neubig retaliated against him for
having exercised his rights under the First Amendment, (2) the Town and Merola violated the Plaintiff's due process

have filed a motion for summary judgment pursuant to Fed. R. Civ. P. 56. (Doc. #75). The Town and Merola have filed a separate motion for summary judgment pursuant to Fed. R. Civ. P. 56. (Doc. #77).   For the reasons that follow, the motion for summary judgment filed by the Defendants Barrett, Augur, and Neubig (Docs. #75) is GRANTED, and the motion for summary judgment filed by the Defendants Town of North Branford and Merola (Doc. # 77) is GRANTED in part and DENIED in part.

## I. FACTS

### A. Background

The Town of North Branford hired the Plaintiff in 1980 to conduct road maintenance for the Department of Public Works ("DPW").  The Plaintiff became a highway leadman, which is a supervisory position within the DPW, in 2004.  At all relevant times, the Plaintiff was one of four leadmen. Francis Merola was the Director of Public Works and the Plaintiff's immediate supervisor.  Mark Barrett, Bryan Augur, and David Neubig were highway employees within the DPW.

As a highway leadman, the Plaintiff supervised the highway employees, including Barrett, Augur and Neubig, checked on job assignments, and worked with the crews.  The Plaintiff was responsible for reporting to Merola if employees treated each other inappropriately and his own efforts to correct the issue failed.  The Plaintiff was also responsible for reporting to Merola if he thought an employee was sleeping or otherwise unable to carry out an assignment

---

rights under the Fourteenth Amendment, and (3) Merola, Barrett, Augur, and Neubig negligently inflicted emotional distress upon the Plaintiff. The Defendants addressed these claims in their motions for summary judgment and the Plaintiff did not respond in opposition.  A court "'may deem a claim abandoned when a party moves for summary judgment on one ground and the party opposing summary judgment fails to address the argument in any way.'" Barlow v. Connecticut, 319 F. Supp. 2d. 250, 266-67 (D. Conn. 2004) (quoting Taylor v. City of New York, 269 F. Supp. 2d 68, 75 (E.D.N.Y.2003)). Thus, the Court deems these claims abandoned.

because he was hung over or drunk.  Furthermore, the Plaintiff was to report to Merola misuse of the time clock or DPW equipment, or any other violation of work rules.

At all relevant times, the Plaintiff was a union member. The Preamble to the Collective Bargaining Agreement ("CBA") between the Town of North Branford and the North Branford Public Works Union ("the Union") in effect from July 1, 2005, until June 30, 2008, stated that "[a]n obligation rests upon management, upon the Union and upon each employees [sic] to render honest, efficient and economical service."  (Doc. #75-31, at 3.)  Article II of the CBA prohibited "discrimination, threat, penalty, coercion or intimidation of any kind against any employee by reason of race, creed, color, religious belief, sex, age, union membership or union activity." (Id. at 4.)  Article XII contained a grievance procedure to address grievances "arising out of matters covered by this Agreement and disputes and consultations on any questions arising out of the employer/employee relationship . . . ." (Id. at 18.)  Per Article XII, the employee first presented the grievance, through his steward, to his immediate supervisor.  If further review was considered necessary, the Union requested a meeting with the Town Manager. The Town Manager would call a meeting to discuss the problem, and then render a decision.  For yet further review, a party could file a notice of appeal to submit the matter to arbitration by the State Board of Mediation and Arbitration. The decision of the arbitrators was final and binding on all parties.

Article XIII required that a complaint concerning unsafe work conditions "be considered immediately by representatives of the Town and the Union," (id.), and allowed for the filing of a grievance if the issue continued. Article XV covered attendance, correction of time cards, necessity to request permission before leaving work early, duration and number of break periods, immediate reporting of injuries, responsibility to return tools and equipment at the end of shifts, and responsibility to drive or handle Town equipment in a prudent manner.

3

**B.  The Plaintiff's Complaints, August 2005 - February 2008**

From August 2005 through February 2008, the Plaintiff complained to Merola on numerous occasions about improper conduct on the part of DPW employees that the Plaintiff supervised. This conduct included the repeated use of vulgar, demeaning, and denigrating language directed at the Plaintiff and other DPW employees, crew members neglecting or refusing to perform jobs properly assigned to them by the Plaintiff or Merola, misuse of time cards and DPW equipment by crew members, surveillance of the Plaintiff by other DPW employees, and crew members' attendance and punctuality.

The following are some examples of the improper conduct alleged by the Plaintiff. These specific examples, while not a complete list of the Plaintiff's complaints, are representative of the various types of complaints registered by the Plaintiff.

On October 19, 2005, a roller fell off the back of the Plaintiff's truck onto the street. The Plaintiff had made sure that the roller was fastened before driving. He later was told that Neubig had unhooked it without informing him and against the advice of fellow crewmembers.

On November 8, 2005, the Plaintiff complained that when he questioned Neubig about a job assignment, Neubig responded by swearing at the Plaintiff and stating that the Plaintiff was not his boss. Merola issued Neubig a verbal warning. On November 14, 2005, the Plaintiff complained to Merola about how Merola had handled the situation with Neubig. In response, Merola called the Plaintiff a backstabber, threatened a write-up for insubordination, and walked out of the garage. On November 15, 2005, Merola "admitted that he could have handled [the

4

November 14, 2005 situation] better."    (Doc. #75-2, at 21.) The Plaintiff and Merola then "shook hands and went back to work." (Id. at 22.)

On January 20, 2006, the Plaintiff complained to Merola that Barrett and Augur were not cooperating at a job site. In response, Merola called both Barrett and Augur into his office. Merola also questioned the Plaintiff as to why he allowed Barrett to drive his personal vehicle to the job site. The Plaintiff indicated that he thought Barrett had permission to do so, even though he did not agree with or approve of that permission.  Between January 23, 2006 and January 26, 2006, the Plaintiff received anonymous calls from the DPW garage to his cell phone, calling him a backstabber and telling him to watch his back. The Plaintiff does not know who made these calls.

On February 22, 2006, the Plaintiff observed Barrett's personal truck loaded with firewood. Merola had told the Plaintiff that crewmembers had permission to take firewood from their tree-cutting jobs but could not load it onto personal trucks on Town time. The Plaintiff questioned Barrett on the matter and Barrett stated he had permission to take the wood and the Plaintiff should "[m]ind your own fucking business." (Doc. # 78, at 6, ¶ 31.)

On March 22, 2006, the Plaintiff complained to Merola about Barrett's vulgar language. The Plaintiff had approached Barrett because he believed that Barrett was avoiding job assignments, to which Barrett retorted, "Fuck the Town and fuck you."  (Id. at 6, ¶ 34.)  Four days later, Barrett came to the Plaintiff's desk and asked him, if front of other employees "if someone had lost a cock ring as some cocksucker may have it and that it might belong to someone in this room." (Doc. # 75-2, at 33.).  The Plaintiff does not recall reporting this event to Merola.  On March 28, 2006, the Plaintiff reported to Merola a conversation he overheard between Barrett and his friend at a coffee shop. When asked if he still worked for the Town,

Barrett had answered, "Sure, where else can you go, get paid, fuck um, and do nothing every day." (Doc. # 78, at 7, ¶ 36.)

On September 12, 2006, the Plaintiff reported to Merola that personal items, including his logbook, were missing from his desk and work orders had been stapled to the desk. The Plaintiff does not know who was responsible for these actions. On October 6, 2006, after Barrett had signed up to work overtime, the Plaintiff overheard Barrett tell another DPW employee to also sign up for overtime so he would not have to work with "the nigger," in reference to Tubaya. (Doc. # 75-2, at 45.) On October 20, 2006, the Plaintiff approached Barrett and asked if they could start their relationship anew. Barrett allegedly responded, "no fucking way" and said that the Plaintiff was an "asshole" and a "backstabber." (Doc. # 78, at 8, ¶ 44.)

On October 23, 2006, as the crew was leaving the garage, Barrett put a white hood over his head and waved to Merola, who waved back. A couple of days later, Barrett and Neubig allegedly remarked about "working with niggers." (Doc. #75-2, at 50).

On December 13, 2006, Barrett arrived at a job site with his personal truck. When notified that work rules disallowed personal trucks at the job site, Barrett responded, "I do what I want." (Doc. # 78, at 10, ¶ 53.) At lunch, Barrett talked about "niggers, the KKK, and white trash." (Id.) When later told that Merola wanted the trucks washed, Barrett stated, "fuck that," and drove off with Augur. (Id.)

On February 6, 2007, Barrett allegedly took an hour lunch break, instead of the permitted 30 minutes. Later that day, while Tubaya was building a cage for the stockroom, Barrett asked Tubaya if he was building the cage for himself and his kin. Barrett then called Tubaya a "cracker" and talked with Neubig about "niggers," in reference to Tubaya. (Id. at 12, ¶ 65.) The Plaintiff did not report, or does not recall reporting, any of these incidents to Merola. The next

6

day, the Plaintiff was warned that someone was starting a rumor that he was taking material from the garage, and that Augur was telling others that the Plaintiff was tape recording everyone.

On March 26, 2007, the Plaintiff noticed Barrett and Neubig repeatedly drive by as he spoke with a homeowner.  Later that day, the Plaintiff noticed Barrett and Neubig following him while he was out checking on jobs.  Also on that day, someone allegedly burned Tubaya's lunch in the toaster.  The Plaintiff alleges, based on rumor in the office, that Neubig deliberately turned the toaster's heat up to 400 degrees, causing it to burn the lunch. At the end of that day, the Plaintiff observed that Barrett and Neubig had not patched the roads, as assigned to them.  The Plaintiff complained to Merola about all these incidents.

On May 30, 2007, Augur poured cold water over the top of a "compactor" in an apparent attempt to crack this piece of Town equipment. On June 7, 2007, the Plaintiff informed Merola that someone had put diesel fuel into the muffler on the curb box, causing  oil to spray out at him as he started the machine.  Merola investigated but no one admitted to the act.  (Doc. #75-4, at 25-26).  On June 29, 2007, the Plaintiff complained to Merola that he had observed Barrett, Neubig, and Augur working on Barrett's personal lawn mower on Town time the day before.

On December 9, 2007, during a crew meeting with Merola, Barrett commented, "You know what they say, you can't trust a nigger," in reference to Tubaya.  (Doc. #75-2, at 125.) Merola "[k]ind of shrugged it [Barrett's comment] off, said I'm going to have to talk to him." (Id. at 125-26.)  On December 12, 2007, the Plaintiff complained that someone had rummaged through his desk, broke the key in the lock, and left a picture with sexual ads for men on his desk.  The Plaintiff does not know who was responsible.

In addition to registering complaints about the conduct of DPW crew members, the Plaintiff also complained to Merola on more than one occasion about Merola's failure to rectify

workplace harassment and racial discrimination. The Plaintiff also brought his complaints to the attention of union representatives at both the local and union headquarters levels. The Plaintiff never filed a grievance concerning his complaints because the representative from the union headquarters "told me it was not a union problem." (Doc. # 75-3, at 80.) That same union representative "advised me to get an attorney because he didn't want to get involved." (Id.)

### C. The Events of February 15, 2008

On February 15, 2008, the Plaintiff drove his Town truck to a location where he had seen Augur. At that time, the radio in the Plaintiff's Town truck was not working. When he pulled up to Augur's location, the Plaintiff realized that Augur was speaking on his personal phone to Barrett. The Plaintiff then attempted to convey, through Augur, a job assignment to Barrett, who the Plaintiff did not believe was working on an assignment at that time. Barrett responded, "Fuck him, if he wants to tell me anything, he's to call me on the Town radio." (Doc. #75-3, at 39-40.)

Later as the Plaintiff was leaving the DPW shop, Barrett gave him "the double finger," i.e., "[m]iddle fingers extended upwards[.]" (Id. at 40.) Merola subsequently spoke with Barrett, who told Merola that he had done a "shame on you" signal with his index fingers. (Doc. #75-4, at 15-16). Barrett also told Merola that prior to the hand gesture, the Plaintiff had accused Barrett of doing nothing and had sworn at him. At the time the Plaintiff accused Barrett of not working, Barrett and another DPW employee were carrying out an assignment as directed by Merola.

Later that day, Merola called the Plaintiff and began yelling, "Who the fuck are you to question my authority?" (Doc. #75-3, at 41.) The Plaintiff attempted to calm Merola down but Merola continued to swear at him, so the Plaintiff hung up. Merola called back to ask the Plaintiff if he had told Augur to convey an assignment to Barrett and the Plaintiff replied, "yes."

(Id.)  Merola began yelling and swearing again, saying that the Plaintiff had "no fucking right to do what [he was] doing and to question [Merola]."  (Id. at 42.)  The Plaintiff hung up again. Merola called a third time and "was agitated and hostile." (Id.) The Plaintiff suggested that Merola call the Plaintiff's union representative and the Town manager if he had anything further to say and hung up. Merola called back a fourth time to notify the Plaintiff "that we have a meeting with the Town Manager today." (Id. at 42-43.)    The Plaintiff, shaken, subsequently went back to the DPW garage, told Merola that he was going home sick, and left.

### D. Plaintiff's Medical Leave of Absence and Complaint to Interim Town Manager

Following the events of February 15, 2008, the Plaintiff was told by his doctor that he "should stay out of work for a little while." (Id. at 71.)  The Plaintiff remained out of work until August 2008. On March 2, 2008, the Plaintiff applied for workers' compensation by completing a Town of North Branford Employee's Record of Injury form.

On March 4, 2008, the Plaintiff met with Merola and Mike Paulhus ("Paulhus"), Interim Town Manager for North Branford, to discuss his complaints of illegal and unethical practices at the DPW.  Paulhus subsequently reported that while he did not believe there was any evidence to support the Plaintiff's allegations of sexual harassment, the Plaintiff's allegations of unlawful municipal practices and other unethical and illegal practices warranted an investigation. The Town hired Attorney Michael J. Rose to conduct this investigation. Attorney Rose's four-week investigation confirmed many of the practices complained of by the Plaintiff, but also included a finding that the Plaintiff stole Town-owned oil for his personal truck. According to the Plaintiff, he took Town-owned oil and used it in his personal truck only when he was using his truck for Town business.

### E. The Plaintiff's Return to Work and Subsequent Filing of Lawsuit

On August 1, 2008, the Plaintiff underwent an independent medical examination. The medical examiner, Dr. Ciarcia, determined, and the Plaintiff agreed, that the Plaintiff could return to work. On August 13, 2008, Richard Branigan ("Branigan"), the new Town Manager, instructed the Plaintiff to return to work on August 18, 2008.  Branigan informed the Plaintiff that he would meet with him personally to discuss protections envisioned by the Town in response to the Plaintiff's past complaints. The Town also hired Dave Ryan, of the State Board of Mediation and Arbitration, to act as an ombudsman to mediate potential issues, and to be accessible to the Plaintiff and any other DPW employee for discussion on sensitive matters. Furthermore, the Town required all crewmembers to attend a harassment training session conducted by Attorney Rose.  On August 18, 2008, the Plaintiff returned to work and filed the instant lawsuit.

### F. The Loudermill Meeting

On September 5, 2008, the Plaintiff received a Loudermill notice[3] instructing him to attend a meeting to discuss the apparent removal of Town-owned property (oil) from the DPW facility and the use of Town resources (computer) for personal business purposes. The Plaintiff and his Union representative attended the Loudermill meeting on September 9, 2008.  At the meeting, the Plaintiff stated that he had given the Public Works secretary an outside contractor's invoice and asked her if she could replace the contractor's name with the name of the Plaintiff's

---

[3] An employee who has a constitutionally protected interest in his employment, such as a tenured public employee, "is entitled to oral or written notice of the charges against him, an explanation of the employer's evidence, and an opportunity to present his side of the story," before he may be deprived of that property interest. Cleveland Board of Educ. v. Loudermill, 470 U.S. 532, 546 (1985).

company[4]. However, the Plaintiff never used the computer himself and made his request while he and the secretary were on their lunch break.

The following day, the Plaintiff received a letter from Merola, stating, "During the discussion and by your own admission, at least one instance of inappropriate use of Town resources occurred.  These issues are serious in nature [and] must be avoided at all times. Therefore, you are hereby warned in writing that any such behavior, or that of any similar nature, in the future, will result in further disciplinary action being taken against you."  (Dkt. #75-25). While it is not entirely clear, it appears that this written warning related to the alleged improper use of a Town computer[5]. The Plaintiff did not grieve this written warning.  The Plaintiff's union representative had told him that "everybody got a warning and not to fight it, that it will go away in my file in no time." (Doc. # 75-3, at 87.)

### G. The Disciplinary Memos

In September 2009, the Plaintiff discovered several disciplinary memos, dating from 2005 and 2006, in his personnel file.  The Plaintiff reviewed his personnel file with Branigan and requested removal of the disciplinary memos pursuant to the CBA and Union rules. During the review of his personnel file with Branigan, the Plaintiff discovered a disciplinary memo, written by Merola, relating to an incident where the Plaintiff allegedly left work early. The Plaintiff was not aware of this disciplinary memo, or the alleged incident, prior to the meeting with Branigan, nor did the Plaintiff receive a copy of the memo as required by the CBA. The Plaintiff did not file a grievance because the Town removed the memos from the Plaintiff's personnel file per the Plaintiff's request.

---

[4] In addition to working for the DPW, the Plaintiff also operated   his own tree-cutting business.
[5] The Loudermill notice had characterized the allegation concerning the computer as "[u]se of Town resources (computer) for personal business purposes." (Doc. # 75-24.)

**H. Plaintiff's Arrest and Resignation**

On October 2, 2009, Barrett and Neubig reported to Branigan that they had observed the Plaintiff remove a black aerosol can from a Town truck and place it in his personal truck. Detective Kenneth McNamara of the North Branford Police Department responded to a complaint made by Merola of a possible theft at the DPW garage and informed the Plaintiff that he was investigating a report that the Plaintiff had taken a can of spray paint from the Town garage. The Plaintiff consented to a search of his personal truck, during which Detective McNamara found a can of spray lubricant. The Plaintiff testified at his deposition that "I don't recall taking a can out of the truck and putting it [in] my truck." (Doc. # 75-3, at 103.) Detective McNamara subsequently told the Plaintiff that the can found in the Plaintiff's personal truck did not match other cans of the same lubricant stored in the Town garage in terms of size and lot number. Detective McNamara then told the Plaintiff, "That's probably the end of it." (Doc. # 83-3, at 8.) The Plaintiff then asked Detective McNamara to report his findings to Merola, who responded by stating, "I'm glad it worked out the way it did. . . .[L]let's put this behind us. . . . And [Detective McNamara] said it's over and done with." (Id.)

On October 6, 2009, Barrett and Neubig filed witness statements with the North Branford Police in which they both stated that they had seen the Plaintiff take a black can from a Town truck and place the can in his personal truck on October 2, 2009.  On October 8, 2009, the Plaintiff was arrested, pursuant to an arrest warrant, on the charge of larceny in the sixth degree. The arrest warrant contained Detective McNamara's sworn statement that he had received information during his investigation indicating that the spray lubricant found in the Plaintiff's truck is not sold in any retail store and that the can found in the Plaintiff's truck was made on the same day as the other cans stored in the Town's garage. Detective McNamara told the Plaintiff

that "[t]he Town Manager was insisting that we prosecute." (Doc. # 83-3, at 9.) That same day, the Plaintiff received a letter from Branigan placing him on paid administrative leave.   On October 19, 2009, the Plaintiff attended an administrative interview with Branigan to discuss the Plaintiff's actions on October 2, 2009. At the administrative interview, Branigan said to the Plaintiff, "I don't believe you, I don't believe you're telling the truth; and in your pension plan it says if you're untruthful we have the right to take your pension."   (Doc. #75-3, at 99.)   On January 15, 2010, the Plaintiff  resigned from his employment with the Town.  According to the Plaintiff, he had consulted with his attorney and his union representative and "decided to take the pension plan because I was out of funds, I couldn't fight it." (Id.)

The plaintiff attended court proceedings for the criminal charge against him.  On one such occasion, the prosecutor showed the Plaintiff the cover of his file, on which was written "a call from the Town Manager's office to prosecute this case to the fullest."  (Doc. #83-3, at 10-11.)  Ultimately, the Court dismissed the criminal charges against the Plaintiff.

## II. STANDARD

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  A fact is material if it "might affect the outcome of the suit under the governing law. . . ." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  A dispute over a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  Id.

A party asserting, or disclaiming, a genuine dispute of material facts "must support the assertion by: (A) citing to particular parts of materials in the record . . . or (B) showing that the materials cited to do not establish the absence or presence of a genuine dispute, or that an

adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1). "The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." Anderson, 477 U.S. at 252.  When the Court rules on a summary judgment motion, "The evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in his favor."  Id. at 255. "Permissible inferences must still be within the range of reasonable probability, however, and it is the duty of the court to withdraw the case from the jury when the necessary inference is so tenuous that it rests merely upon speculation and conjecture." Radiation Dynamics, Inc. v. Goldmuntz, 464 F.2d 876, 887 (2d Cir. 1972) (internal quotation marks omitted).  Summary judgment is appropriate "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial."  Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986).

## III. DISCUSSION

### A.  Retaliation for Exercise of First Amendment Rights

The Supreme Court has recognized the need to protect against First Amendment retaliation to "ensure that citizens are not deprived of fundamental rights by virtue of working for the government. . . ."  Connick v. Myers, 461 U.S. 138, 147 (1983).  Although "[g]overnment employers, like private employers, need a significant degree of control over their employees' words and actions," Garcetti v. Ceballos, 547 U.S. 410, 418 (2006), "public employees do not surrender all their First Amendment rights by reason of their employment."  Id. at 417.  A public employee is afforded protection against First Amendment retaliation if: "'(1) the speech at issue was made as a citizen on matters of public concern rather than as an employee on matters of personal interest; (2) he or she suffered an adverse employment action; and (3) the speech was at

14

least a substantial or motivating factor in the adverse employment action.'" Everitt v. DeMarco, 704 F. Supp. 2d 122, 129 (D. Conn. 2010) (quoting Johnson v. Ganim, 342 F.3d 105, 112 (2d Cir. 2003)); see also Mandell v. County of Suffolk, 316 F.3d 368, 382 (2d Cir. 2003) (requiring a "causal connection . . .  between the speech and the adverse employment action, so that it can be said that his speech was a motivating factor in the determination" (internal quotation marks omitted)).  Even if an employee establishes a *prima facie* case of retaliation, courts must proceed to balance "the interests of the [employee], as a citizen, in commenting upon matters of public concern and the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees." Pickering v. Bd. of Ed. of Twp., 391 U.S. 563, 568 (1968).

This Court begins the analysis by determining whether the Plaintiff's speech receives constitutional protection.  The Court will proceed to the second and third prongs of the First Amendment retaliation test only if it finds that the Plaintiff engaged in protected speech.

### 1)  Constitutionally Protected Speech

In his Amended Complaint, the Plaintiff alleges that the Town and Merola "retaliated against [him] as a result of his protected speech and petitioning the government for redress of his grievances…." (Doc. #54, at 8, 9, ¶¶ 51, 42).  In his brief in opposition to summary judgment, the Plaintiff asserts that "the First Amendment activity which is at the heart of the plaintiff's First Amendment retaliation claim" is his "filing of the lawsuit [on August 18, 2008] which ultimately was transformed into the present litigation." (Doc. #85, at 6, 7).  The Defendants' reply brief acknowledges the Plaintiff's clarification that the filing of this lawsuit is "'the heart' of his First Amendment claim . . . ." (Doc. #88, at 2).  Therefore, because both parties are litigating the matter on the basis that the Plaintiff is alleging that his lawsuit is the protected activity at issue,

this Court considers his First Amendment retaliation claim as arising under the Petition Clause of the First Amendment.  See e.g. Borough of Duryea v. Guarnieri, 131 S. Ct. 2488, 2494 (2011) (analyzing that case "under the Petition Clause, not the Speech Clause [because] [t]he parties litigated the case on the premise that [the respondent's] grievances and lawsuit are petitions protected by the Petition Clause"); Looney v. Town of Marlborough, Civil Action No. 3:10-cv-1068 (VLB), 2011 WL 3290202, at *13 (D. Conn. July 30, 2011) (concluding that claims of retaliation in response to the filing of a lawsuit are "more properly characterized as Petition Clause claims" than as Speech Clause claims).  This is consistent with Supreme Court precedent recognizing that "the right of access to courts for redress of wrongs is an aspect of the First Amendment right to petition the government. . . ."  Sure-Tan, Inc. v. NLRB, 467 U.S. 883, 896-97 (1984).

The Plaintiff asserts that, "[A]s everyone knows, access to the courts and the utilization of the judicial forum to air grievances is classically protected speech.  The right of access to the courts has long been held protected by the First Amendment."  (Doc. #85, at 8).  However, in Guarnieri, the Supreme Court rejected the conclusion that "a public employee who has petitioned the government through a formal mechanism such as the filing of a lawsuit . . .  is protected under the Petition Clause from retaliation for that activity, even if the petition concerns a matter of solely private concern."  131 S. Ct. at 2493 (internal quotation marks omitted).  "The close connection between [the right to speak and the right to petition] has led Courts of Appeals other than the Third Circuit to apply the public concern test developed in Speech Clause cases to Petition Clause claims by public employees."  Id. at 2495; see e.g. Morris v. City of Colo. Springs, 666 F.3d 654, 663 (10th Cir. 2012) (because the Plaintiff's petition concerned an employment dispute, not a matter of public concern, it could not provide a basis for a First

Amendment retaliation claim). <u>See</u> <u>also</u> <u>Ruotolo v. City of New York</u>, 514 F.3d 184, 187-88 (2d Cir. 2008) (stating, before the decision in <u>Guarnieri</u>, "To hold…that filing a lawsuit alleging retaliation for non-protected speech would give rise to a First Amendment complaint - - would defy logic . . . .").

Thus, "If a public employee petitions as an employee on a matter of purely private concern, the employee's First Amendment interest must give way, as it does in speech cases." <u>Guarnieri</u>, 131 S. Ct. at 2500 (citing <u>San Diego v. Roe</u>, 543 U.S. 77, at 82–83 (2004)). The <u>Guarnieri</u> Court warned,

> Unrestrained application of the Petition Clause in the context of government employment would subject a wide range of government operations to invasive judicial superintendence. Employees may file grievances on a variety of employment matters, including working conditions, pay, discipline, promotions, leave, vacations, and terminations. Every government action in response could present a potential federal constitutional issue. Judges and juries, asked to determine whether the government's actions were in fact retaliatory, would be required to give scrutiny to both the government's response to the grievance and the government's justification for its actions. This would occasion review of a host of collateral matters typically left to the discretion of public officials. Budget priorities, personnel decisions, and substantive policies might all be laid before the jury. This would raise serious federalism and separation-of-powers concerns. It would also consume the time and attention of public officials, burden the exercise of legitimate authority, and blur the lines of accountability between officials and the public.
>
> ….
>
> The public concern test was developed to protect these substantial government interests. Adoption of a different rule for Petition Clause claims would provide a ready means for public employees to circumvent the test's protections. . . .
>
> Articulation of a separate test for the Petition Clause would aggravate potential harm to the government's interests by compounding the costs of compliance with the Constitution. A different rule for each First Amendment claim would require employers to separate petitions from other speech in order to afford them different treatment; and that, in turn, would add to the complexity and expense of compliance with the Constitution.

131 S. Ct. at 2496-98 (internal citations omitted); see also Connick, 461 U.S. at 154 (warning that it would be a "Pyrrhic victory" for the principles of free expression if employees were allowed to constitutionalize employee grievances).

The concerns expressed in Guarnieri are directly applicable in this case. The Plaintiff's claims expose the Department of Public Works' personnel decisions, working conditions, and substantive work policies to judicial scrutiny. Whereas these matters are generally suited for public officials, they are now before the Court. Under Guarnieri, this Court cannot afford automatic protection to the Plaintiff's petition just because it utilizes the Court system. This Court will analyze the Plaintiff's allegedly protected petition under the same test it would use to analyze allegedly protected speech. The Court must consider two separate questions: (1) whether the Plaintiff petitioned as a *citizen*, rather than as a DPW highway leadman, and (2) whether the subject of the Plaintiff's petition was on a matter of *public concern*, rather than private concern. See e.g. Jackler v. Byrne, 658 F.3d 225, 235 (2d Cir. 2011) ("In Garcetti, the Court parsed the [protected speech inquiry] into separate questions as to (1) whether the subject of the employee's speech was a matter of public concern and (2) whether the employee spoke 'as a citizen' rather than solely as an employee.").

The Supreme Court has held "that when public employees make statements pursuant to their official duties, the employees are not speaking as citizens for First Amendment purposes, and the Constitution does not insulate their communications from employer discipline." Garcetti, 547 U.S. at 421. The Court defined speech made pursuant to an employee's official duties as "speech that owes its existence to a public employee's professional responsibilities. . . ." Id. The determination of whether or not speech owes its existence to professional responsibilities requires a "practical" inquiry. Id. at 424. "Formal job descriptions often bear

18

little resemblance to the duties an employee actually is expected to perform, and the listing of a given task in an employee's written job description is neither necessary nor sufficient to demonstrate that conducting the task is within the scope of the employee's professional duties for First Amendment purposes." Id. at 424-25.  Furthermore, neither the fact that speech was made inside the office nor the fact that speech concerned the subject matter of the employee's employment is dispositive in this inquiry.  Id. at 420-21.

The Garcetti Court did note, "Employees who make public statements outside the course of performing their official duties retain some possibility of First Amendment protection because that is the kind of activity engaged in by citizens who do not work for the government."  Id. at 423.  However, scrutinizing all employee statements, even those made during the performance of job duties, "would be to demand permanent judicial intervention in the conduct of governmental operations to a degree inconsistent with sound principles of federalism and the separation of powers."  Id.  In sum, the Court did not have "occasion to articulate a comprehensive framework for defining the scope of an employee's duties in cases where there is room for serious debate," id. at 424, but made clear that the "controlling factor" is whether speech is "pursuant to . . . official duties."  Id. at 421 (emphasis added).

Garcetti concerned a deputy district attorney ("Ceballos") claiming First Amendment retaliation in response to his memorandum recommending dismissal of a case because of possible governmental misconduct.  Id. at 413-14.  It was undisputed that Ceballos' duties included advising his supervisor about how to proceed with a pending criminal case.  Id. at 421.  The Court concluded that, "Ceballos did not act as a citizen when he went about conducting his daily professional activities, such as supervising attorneys, investigating charges, and preparing filings.  In the same way he did not speak as a citizen by writing a memo that addressed the

proper disposition of a pending criminal case." Id. at 422.  Ceballos wrote the memo "because that is part of what he . . . was employed to do. . . . The significant point is that the memo was written pursuant to Ceballos' official duties." Id. at 421.  The Court also determined that "[w]hen a public employee speaks pursuant to employment responsibilities . . . there is no relevant analogue to speech by citizens who are not government employees." Id. at 424. As a result, the Court refused to afford First Amendment protection to Ceballos' memo. Id. at 426.

Various cases within this Circuit have applied Garcetti in a manner relevant to this case. In Weintraub v. Bd. of Ed., 593 F.3d 196 (2d. Cir. 2010). the Second Circuit Court of Appeals found that the Plaintiff teacher's grievance, concerning a lack of cooperation from students and the failure of the Assistant Principal to render discipline, was filed pursuant to his official duties. The grievance "was part-and-parcel of his concerns about his ability to properly execute his duties as a public school teacher - - namely, to maintain classroom discipline, which is an indispensable prerequisite to effective teaching and classroom learning." Id. at 203 (internal quotation marks and citation omitted).  As such, the Plaintiff's grievance received no First Amendment protection. Id. at 205.  See also Massaro v. N.Y.C. Dept. of Educ., No. 11-2721-cv, 2012 WL 1948772, at *2 (2d Cir. May 31, 2012) ("[The Plaintiff's] complaints [regarding unsanitary working conditions] concerned her ability to properly execute [her] duties as a public school teacher, because they were aimed at resolving her health issues so that she could continue to teach, and ensuring that she had a safe and clean environment in which to work. . . .")(internal quotation marks and citation omitted); Schoolcraft v. City of New York, No. 10 Civ. No. 6005 (RWS), 2012 WL 2161596, at *10 (S.D.N.Y. June 14, 2012) (concluding that a police officer's report of illegal policing practices was part-and-parcel of his ability to properly execute his duties).

Weintraub's conclusion that the Plaintiff "spoke pursuant to his job duties [was] supported by the fact that his speech ultimately took the form of an employee grievance, for which there is no relevant citizen analogue." Weintraub, 593 F.3d at 203. "The lodging of a union grievance is not a form or channel of discourse available to non-employee citizens, as would be a letter to the editor or a complaint to an elected representative or inspector general." Id. at 204. However, the Court acknowledged that while the lack of a citizen analogue does bear on whether the public employee is speaking as a citizen, that factor is "not dispositive." Id. (quoting Garcetti, 547 U.S. at 420).

In Matthews v. Lynch, No. 3:07-cv-739 (WWE), 2011 WL 1363783, at *1 (D. Conn. Apr. 11, 2011), the Plaintiff worked as an internal affairs officer for the Connecticut State Police ("CSP") and was charged with the duty to investigate complaints of misconduct by members of the CSP. Through the course of his employment, the Plaintiff "learned that the CSP had a pattern and practice of covering up the misconduct of its officers. This misconduct included the commission of crimes, driving while intoxicated, family violence, misuse of state funds and other acts which would bring discredit to the CSP." Id. The Plaintiff disclosed his findings to the New York State Police and the Connecticut Attorney General's Office. Id. The Plaintiff alleged that he endured the following retaliation in response: a transfer from internal affairs to headquarters, a note left on the Plaintiff's desk bearing the word, "Cancer," denial of his request for transfer out of headquarters over concerns for his physical safety, and being subjected to an internal affairs investigation regarding acts alleged to have occurred years earlier. Id. at *1-2.

The District Court held that the Plaintiff's statements received no constitutional protection because, "His actions in informing authorities about misconduct within the CSP, however laudatory, [were] done in accordance with his professional duties and responsibilities as

a state trooper." Id. at *5.   The Court highlighted the non-dispositive nature of whether the speech in question had a relevant civilian analogue, stating that "[i]t does not tha[t] all citizens are permitted to report misconduct to the NYSP or the Attorney General's Office," since the Plaintiff "did in fact report misconduct to the agencies to which he was supposed to report such misconduct" as part of his job. Id. at *4.   See also Anemone v. Metropolitan Transp. Authority, 629 F.3d 97, 116-17 (2d Cir. 2011) (rejecting the Plaintiff's contention that although his initial contacts with the District Attorney's office were pursuant to his official duties, once he went "outside the chain of command" and persisted in contacts with the District Attorney's office after being told to stop, his speech became protected under the First Amendment). "The chief focus was not whether the avenue was open to all—citizens and employees—but rather on why the plaintiff utilized that avenue." Lynch, 2011 WL 1363783 at *4.   The Second Circuit Court of Appeals summarily affirmed the decision of the District Court in Lynch, finding that because "as an Internal Affairs officer, he had a broad responsibility to investigate and report police misconduct, including the misconduct alleged in the complaint," the Plaintiff's "complaints to outside agencies were 'part and parcel' of his ability to properly execute his duties. . . ." Matthews v. Lynch, No. 11-1734-cv, 2012 WL 1873657, *2 (2d. Cir. May 24, 2012).   The Court of Appeals added, "[The Plaintiff's] additional concession at oral argument that he first reported the misconduct up his chain of command further supports our determination that he was acting pursuant to his employment duties." Id.

Here, the Court concludes that no reasonable jury can find that the Plaintiff's complaints were not made pursuant to his duties as a highway leadman for the Department of Public Works. The Plaintiff testified that he held a duty to check on highway employees and a duty to report inappropriate treatment, crewmembers sleeping on the job, misuse of the time clock or DPW

equipment, and any other violation of work rules. Neither party disputes the fact that the Town specifically required these duties from the plaintiff. See also Barclay v. Michalsky, 493 F. Supp. 2d 269, 277 (D. Conn. 2007) (complaints of work rule violations made to her supervisors by a nurse who "was required as part of her professional responsibility . . . to report the Work Rule violations she suspected" were part of her job duties and not activity protected under the First Amendment).

Complaints of crewmembers (1) harassing the Plaintiff and other colleagues, (2) arriving late and leaving early, (3) failing to cooperate at job sites or carry out job assignments, (4) misusing Town equipment, (5) misusing the time clock, (6) sleeping or drinking on the job, and (7) providing misinformation about the department to outside agencies all serve as "part-and-parcel" of the Plaintiff's concerns as to effectively carrying out his job responsibilities.  Like the Plaintiff in Weintraub, the Plaintiff here sought indispensable prerequisites for him to execute his duties as a supervisor, such as cooperation, discipline, and honesty from his subordinates.  The continuation of any activity alleged in the complaints would not only undermine the Plaintiff's authority as a highway leadman but also lead to wasted government resources.  Certainly, the government employed the Plaintiff as a supervisor to prevent the expenditure of resources on employees who lack integrity and efficiency.  It is therefore practical to believe that when the Plaintiff filed his lawsuit, he was bringing into light exactly that which his employer paid him to identify and report.  As such, the Plaintiff's complaints to supervisors were pursuant to his official duties and cannot receive First Amendment constitutional protection.

This Court's conclusion is supported by the fact that, like the Plaintiff in Lynch, the Plaintiff here first reported the misconduct up the chain of command.  The Plaintiff requested a meeting with his Union representative and Merola to discuss the unethical and illegal activities in

the department.  In addition, while he was on paid medical leave, the Plaintiff met with the Interim Town Manager to report again the unethical and illegal activities.  Lastly, the Plaintiff inquired with his Union representative as to filing a grievance over his complaints, even though the grievances never materialized.  The actions of the Plaintiff, in proceeding up the chain of command and inquiring as to whether he should file a grievance, demonstrate that he believed he was acting pursuant to his official duties requiring him to report the misconduct.

The Plaintiff argues that the lawsuit itself is "at the heart of [his] First Amendment retaliation claim" and that "[t]he defendants cannot claim, and apparently do not claim, that filing a lawsuit in a state court was within the plaintiff's job responsibilities.  Obviously it was not."  (Doc. #85, at 6-8).  Yet, even under this argument, the Plaintiff's First Amendment retaliation claim must fail.  In Matthews v. City of New York, 12 cv 1354 (BSJ), 2012 U.S. Dist. LEXIS 53213  (S.D.N.Y. Apr. 12, 2012),  a New York City police officer claimed he had been subjected to adverse employment action after having complained to his commanding officers about an illegal quota system. The court rejected the plaintiff police officer's contention that in registering his complaints he had not spoken pursuant to his official duties because those duties did not require him to initiate grievance procedures or expose such a problem:

> Here, like the plaintiff in Weintraub, [the plaintiff] attempts to carve out his speech for First Amendment protection by claiming that he was not technically "required" to initiate grievance procedures and/or expose the problem as part of his employment duties. The Court rejects that argument as one that elevates form over substance. As Weintraub observed, "[t]he objective inquiry into whether a public employee spoke 'pursuant to' his or her official duties is a 'practical one' [and][t]he Garcetti Court cautioned courts against construing a government employee's official duties too narrowly." 593 F.3d at 202. By that standard, the Court concludes that [the Plaintiff's] concerns about illegal policing practices are "part-and-parcel" of his ability to "properly execute his duties." Id. at 203.

Matthews, 2012 U.S. Dist. LEXIS 53213, at *7.

As discussed above, the substance of the Plaintiff's petition was a set of complaints that he had made pursuant to his official duties.   This Court cannot accept the Plaintiff's argument that the substance is to be disregarded because the form (filing a lawsuit) is beyond the job duties of a highway leadman.   To reiterate <u>Routolo</u>, "To hold . . . that filing a lawsuit alleging retaliation for non-protected speech would give rise to a First Amendment complaint - -  would defy logic. . . ."  514 F.3d at 188.  This Court cannot afford First Amendment protection the instant in which a plaintiff packages his non-protected complaints into a lawsuit, or in other words, attempts to "constitutionalize the employee grievance." <u>Connick</u>, 461 U.S. at 154.

As was the case in <u>Lynch</u>, this Court does not find the fact that the Plaintiff utilized an avenue available to all citizens, the filing of a lawsuit, to be a dispositive factor.  It is likely that the Plaintiff decided to utilize the avenues of the Court system because his previous communications did not yield the results he sought.  The "controlling factor" is whether the Plaintiff spoke pursuant to his official duties and the Court has concluded that he did.

Because no reasonable jury can find that the Plaintiff petitioned as a citizen rather than as an employee, his petition is not protected under the First Amendment. For that reason, the Plaintiff's First Amendment retaliation claims must fail.  The Town and Merola's motion for summary judgment on counts 1 and 2 is GRANTED.

## B.  Violation of Connecticut General Statute § 31-51q

Under Conn. Gen. Stat. §31-51q,

> Any employer, including the state and any instrumentality or political subdivision thereof, who subjects any employee to discipline or discharge on account of the exercise by such employee of rights guaranteed by the first amendment to the United States Constitution or section 3, 4, or 14 of article first of the Constitution of the state, provided such activity does not substantially or materially interfere with the employee's bona fide job performance or the working relationship between the employee and the employer, shall be liable to such employee for damages caused by such discipline or discharge . . . .

25

"To assert a valid claim under section 31–51q, the plaintiff must show: (1) that she engaged in protected speech, (2) that she was disciplined or fired because of that speech, and (3) that such speech did not substantially or materially interfere with her bona fide job performance or with her working relationship with her employer." Downing v. West Haven Bd. of Ed., 162 F. Supp. 2d 19, 33 (D. Conn. 2001) (citing Lowe v. Amerigas, Inc., 52 F. Supp. 2d 349, 359 (D. Conn. 1999)).

Two recent Connecticut Supreme Court decisions have shed light on the proper analysis of claims alleging violations of §31-51q.  In Perez-Dickson v. City of Bridgeport, 304 Conn. 483 (2012), a public school principal claimed that the defendants violated §31-51q by retaliating against her for filing reports of child abuse by teachers with the state department of children and families. After the jury had returned a verdict for the plaintiff, the defendants filed a renewed motion for a directed verdict, arguing that Garcetti barred the plaintiff's claims because she had spoken pursuant to her official duties as a principal. The Connecticut Supreme Court held that Garcetti did in fact apply to claims alleging a violation of §31-51q through First Amendment retaliation. Id. at 498.  The Court ruled that Garcetti barred the plaintiff's claim because it was undisputed that she spoke pursuant to her official duties.  Id. at 497-98. The Court noted that the plaintiff claimed on appeal that her speech rights under the state constitution were "broader than her rights under the first amendment," but had not made that claim to the trial court. Id. at 498. The Court concluded that because she failed to argue otherwise at trial, "[T]he trial court and the defendants were entitled to assume that her speech rights under the state constitution were coextensive with her first amendment rights."  Id. (citing State v. Gore, 288 Conn. 770, 776 n.7 (2008) ("Because the defendant has not provided a separate analysis of the right under the state constitution, and has not claimed that the state provisions provide greater protection than their

federal counterparts, . . . we treat the . . . rights arising from the state and federal constitutions as coextensive.")).

In Schumann v. Dianon Systems, Inc., 304 Conn. 585 (2012), the companion case decided on the same day as Perez-Dickson, the plaintiff alleged that the defendant had violated §31-51q by terminating his employment as a pathologist because he had raised objections to a new testing process on the basis of patient safety concerns.   Relevant to this case was the plaintiff's argument that,

> [T]he rule set forth in Garcetti is incompatible with §31-51q, because Garcetti establishes a broad class of employees—those speaking pursuant to their official duties—whose speech would be precluded categorically from first amendment protection, while §31-51q avoids such a broad classification and instead requires proof of actual interference with the employee's job performance or working relationships before excluding employee speech from protection.

Id. at 597-98.  The Connecticut Supreme Court rejected this argument and concluded that "the rule in Garcetti . . . applies to claims under §31-51q grounded in the first amendment . . . and must be considered as a threshold matter prior to undertaking the Pickering/Connick balancing test . . ." Id. at 610-11.  The Court applied Garcetti and held that it barred the plaintiff's  §31-51q claim because he had spoken pursuant to his official duties.

The Court has already concluded that the Plaintiff's complaints in this case are not protected speech under Garcetti because the Plaintiff made them pursuant to his official duties as a highway leadman.  Thus, application of Garcetti to the Plaintiff's §31-51q claim results in the claim being barred.  As was the case in Schumann, this Court need not require proof of actual interference with the employee's job performance or working relationships because speech receives no constitutional protection if it cannot pass the initial threshold of the Garcetti analysis.  Furthermore, the Plaintiff has not argued that his rights are broader under the Connecticut

Constitution than under the United States Constitution.  Therefore, this Court assumes that the Plaintiff's speech rights under the state constitution are coextensive with his speech rights under the Federal Constitution.  See Perez-Dickson, 304 Conn. at 498 n.21 ("we see no reason why the trial court should not also be entitled to assume that the state constitution and the federal constitution are coextensive in the absence of any claim to the contrary by the party raising the constitutional issue").

The Town and Merola's motion for summary judgment on count 11 is GRANTED.

## C.  Violation of Due Process Rights

The Due Process Clause of the Fourteenth Amendment "provides heightened protection against government interference with certain fundamental rights and liberty interests." Washington v. Glucksberg, 521 U.S. 702, 720 (1997).  "The Due Process Clause of the Fourteenth Amendment was intended to prevent government from abusing [its] power, or employing it as an instrument of oppression.'  Collins v. City of Harker Heights, 503 U.S. 115, 126 (1992) (internal quotation marks omitted).  "The Clause is phrased as a limitation on the State's power to act, not as a guarantee of certain minimal levels of safety and security. It forbids the State itself to deprive individuals of life, liberty, or property without 'due process of law'. . . ." DeShaney v. Winnebago County Dept. of Social Services, 489 U.S. 189, 195 (1989).

The Plaintiff maintains that the alleged wrongdoing of Barrett, Augur, and Neubig "is properly caracterized [sic] as a substantive due process violation." (Doc. #84, at 6).  "In order to sustain a substantive due process claim, a plaintiff must demonstrate, *inter alia*, that he was deprived of a fundamental constitutional right by government action that is arbitrary or conscience-shocking."  Walker v. City of Waterbury, 361 F.App'x 163, 165 (2d Cir. 2010) (internal quotation marks and citation omitted).  While the parties dispute whether Barrett,

Augur, and Neubig's activities constituted government action for purposes of a §1983 claim, the Court recognizes that "[s]ection 1983 is not itself a source of substantive rights, but merely provides a method for vindicating federal rights elsewhere conferred.  The first step in any [§1983] claim is to identify the specific constitutional right allegedly infringed." Albright v. Oliver, 510 U.S. 266, 271 (1994) (internal quotation marks and citation omitted).   Thus, this Court first looks to identify the specific constitutional right allegedly infringed by Barrett, Augur, and Neubig and will proceed further with the due process analysis only if it finds that specific right to be a fundamental one.

### 1)  Fundamental Right

Generally, the Supreme Court "has always been reluctant to expand the concept of substantive due process because guideposts for responsible decisionmaking in this unchartered area are scarce and open-ended. The doctrine of judicial self-restraint requires us to exercise the utmost care whenever we are asked to break new ground in this field." Collins, 503 U.S. at 125. Analysis of a substantive due process claim requires "a 'careful description' of the asserted fundamental liberty interest." Glucksberg, 521 U.S. at 721 (quoting Reno v. Flores, 507 U.S. 292, 302 (1993)). See also Chavez v. Martinez, 538 U.S. 760, 775-76 (2003) ("Glucksberg requires a 'careful description' of the asserted fundamental liberty interest for the purposes of substantive due process analysis; vague generalities . . . will not suffice."); Giordano v. Conn. Valley Hosp., 588 F. Supp. 2d 306, 319 (D. Conn. 2008) ("Glucksberg . . .  requires a careful, or precise, description of the liberty interest alleged.").

Additionally, although no scientific formula exists for discerning whether a right is fundamental, substantive due process protects only those rights and liberties "which are, objectively, deeply rooted in this Nation's history and tradition, and implicit in the concept of

ordered liberty, such that neither liberty nor justice would exist if they were sacrificed." Glucksberg, 521 U.S. at 720-21 (internal quotation marks and citations omitted); See also Local 342, Long Island Public Service Employees v. Town Bd. of Huntington, 31 F.3d 1191, 1196 (2d Cir. 1994) ("It is well settled that, where the alleged right . . . cannot be considered so rooted in the traditions and conscience of our people as to be ranked as fundamental, notions of substantive due process will not apply") (internal quotation marks omitted).  "The protections of substantive due process have for the most part been accorded to matters relating to marriage, family, procreation, and the right to bodily integrity." Albright v. Oliver, 510 U.S. 266, 272 (1994). "Generally, interests related to employment are not protected [by the Due Process Clause]." Walker, 361 F.App'x at 165. See also McKinney v. Pate, 20 F.3d 1550, 1560 (11th Cir. 1994)("Because employment rights are state-created rights and not 'fundamental' rights created by the Constitution, they do not enjoy substantive due process protection.").

This case does not reach the question of fundamental versus non-fundamental rights because the Plaintiff fails to first provide a careful description of the allegedly infringed right.  In his Amended Complaint, the Plaintiff alleges violation of his due process rights by Barrett, Augur, and Neubig for having "intentionally discriminat[ed] against him in the application of rules and regulations relating to his employment, and by retaliating against him for having exercised rights protected by the First Amendment…."  (Doc. #54, at 14-15).  The Plaintiff abandoned his First Amendment retaliation claims against Barrett, Augur, and Neubig, so this Court only considers the argument that violation of the Plaintiff's due process rights occurred through "intentional[] discriminati[on] against him in the application of rules and regulations relating to his employment."  This vague statement fails to state clearly the fundamental right

allegedly infringed by Barrett, Augur, and Neubig.  The statement describes how the Plaintiff's rights were violated, without identifying the rights themselves.

The Plaintiff fails to offer any clarification in his brief opposing summary judgment, merely noting that "[w]hether a substantive due process right exists is a question of law," (doc. #84, at 9), without carefully describing which right this Court should subject to a "fundamental versus non-fundamental" analysis.  Since the Plaintiff has failed to provide a careful description of the asserted fundamental right, his substantive due process claim must fail.  See Kaluczky v. City of White Plains, 57 F.3d 202, 211 (2d Cir. 1995) ("Although [the plaintiff] asserts in conclusory terms that . . .  acts of retribution violated his substantive due process rights, he does not specify which constitutional rights he is invoking"); Mignault v. Ledyard Pub. Sch., 792 F. Supp. 2d 289, 303 (D. Conn. 2011) ( "Since the Plaintiff's Amended Complaint does not identify a fundamental right that was allegedly denied by the Defendants, the Plaintiff's substantive due process claim cannot be sustained. . . .").

For the reason stated above, Barrett, Augur, and Neubig's motion for summary judgment on counts 8, 9, and 10 is GRANTED.

## D.  Intentional Infliction of Emotional Distress

In addition to his federal claims, the Plaintiff brings a state law tort claim for intentional infliction of emotional distress. A plaintiff claiming intentional infliction of emotional distress must plead and prove four elements, one of which is "'that the conduct was extreme and outrageous.[6]'" Dyson v. Colon, No. CV106016063S, 2011 Conn. Super. LEXIS 2401, at *8 (Conn. Super. Sept. 15, 2011) (quoting Appleton v. Board of Education, 254 Conn. 205, 210

---

[6] The other three elements are "that the actor intended to inflict emotional distress or that he knew or should have known that emotional distress was the likely result of his conduct; . . . that the defendant's conduct was the cause of the plaintiff's distress; and  [] that the emotional distress sustained by the plaintiff was severe." Dyson, 2011 Conn. Super. LEXIS 2401, at *7-8 (internal quotation marks omitted).

(2000)).   In responding to the Defendants' motions for summary judgment, the Plaintiff identified the following as "extreme and outrageous" conduct: "The defendants caused the plaintiff to be prosecuted for a crime they knew he had not committed and pressured the prosecutor to pursue that prosecution despite its obvious lack of merit. Ultimately he was vindicated and the court dismissed the charge, but only after the defendant municipality (acting through its Town Manager) and the plaintiff's supervisor had done all within their power to get him convicted despite his innocence." (Doc. # 85, at 17-18.)

In Connecticut, liability for intentional infliction of emotional distress is found "only where the conduct has been so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community. Generally, the case is one in which the recitation of the facts to an average member of the community would arouse his resentment against the actor, and lead him to exclaim, Outrageous!" Carrol v. Allstate Insurance Co., 262 Conn. 433, 443 (2003) (internal quotation marks omitted). In contradistinction to conduct that would satisfy the "extreme and outrageous" requirement for purposes of an intentional infliction of emotional distress claim, conduct "that is merely insulting or displays bad manners or results in hurt feelings is insufficient to form the basis for an action based upon intentional infliction of emotional distress." Id.

In responding to the Defendants' motions for summary judgment as to the claims of intentional infliction of emotional distress, the Plaintiff failed to identify any particular action taken by Barrett, Augur, or Neubig that would constitute extreme and outrageous conduct. For that reason alone, those Defendants are entitled to summary judgment as to that claim. See Adamczyk v. New York State Department of Correctional Services, 474 F.App'x 23, 25 (2d Cir. 2012 ("The moving party is entitled to summary judgment where the plaintiff has failed to come

forth with evidence sufficient to permit a reasonable juror to return a verdict in his or her favor on an essential element of a claim on which the plaintiff bears the burden of proof." (internal quotation marks omitted)). Barrett, Augur, and Neubig's motion for summary judgment on counts 14, 15, and 16 is GRANTED.

The Town and Merola argue that they are entitled to summary judgment as to the Plaintiff's intentional infliction of emotional distress claims against them for the reason that the Plaintiff has failed to allege extreme or outrageous conduct on the part of either of those two Defendants. The Town and Merola contend that "[n]o witness has suggested nor has any admissible evidence been offered to suggest that either Mr. Merola or the Town Manager personally observed Plaintiff take the [can of spray lubricant] from the town truck and place it in his personal vehicle." (Doc. # 88, at 9.) The Court believes this argument misapprehends the Plaintiff's claims. The Court understands the Plaintiff's intentional infliction of emotional distress claims against the Town and Merola to be that after Detective McNamara had responded to the initial complaint and determined that the can of spray lubricant in the Plaintiff's personal vehicle did not match those in the Town garage, these Defendants, knowing that the matter was "over and done with[7]," (doc. # 83-3, at 8), persisted in their efforts to have the Plaintiff arrested and prosecuted.

Although it has been held in Connecticut that "calling the police to report suspected wrongdoing normally does not constitute 'extreme and outrageous' conduct sufficient to impose liability for intentional infliction of emotional distress," there is no "bright-line rule that would uniformly prevent any false report to a police officer from constituting extreme and outrageous conduct." Crocco v. Advance Stores Co., 421 F. Supp. 2d 485, 504 (D. Conn. 2006) (internal

---

[7] The Court reiterates that for purposes of ruling on a summary judgment motion, "[t]he evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in his favor." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986).

quotation marks omitted). "As is the general rule with respect to determining whether conduct was extreme or outrageous, the court will make this determination by considering the specific facts and circumstances of this case." Id. In Crocco, the plaintiff alleged that her supervisor and a co-worker knowingly reported false information to the police in order to create the impression that the plaintiff was stalking or threatening them. As a result of the information provided by her supervisor and her co-worker, the plaintiff was stopped and questioned by the police and was arrested for breach of the peace. The charge against her was later dismissed. Given these circumstances, the court found "that reasonable minds could differ on the question of whether [the supervisor's and the co-worker's] actions in calling the Waterbury Police Department and knowingly reporting false information to [the arresting police officer] so as to give the impression that [the plaintiff] was stalking or threatening them would constitute extreme and outrageous conduct." Id. at 505. See also Deblasi v. Duclos, No. CV054011860S, 2006 Conn. Super. LEXIS 539, at *4 (Conn. Super. Feb. 16, 2006) (allegations that the defendant had filed false and malicious harassment complaints with the police and insisted on prosecution to the fullest extent of the law, which resulted in the plaintiff being arrested and required to appear in court, "could be found by a reasonable fact finder to be extreme and outrageous").

The Court finds that the specific facts and circumstances of this case could satisfy the extreme and outrageous conduct requirement for an intentional infliction of emotional distress claim. Here, the Plaintiff alleges that the Town and Merola insisted that he be arrested and prosecuted after the initial police investigation had exonerated him and the matter was, according to the investigating officer, "over and done with." (Doc. # 83-3, at 8.)  These facts, if proven, are even more extreme than those before the court in Crocco, and the Court believes that "the recitation of the[se] facts to an average member of the community would arouse his resentment

against the actor, and lead him to exclaim, Outrageous!" Carrol, 262 Conn. at 443 (internal quotation marks omitted). Since the Town and Merola's motion for summary judgment, as it pertains to the Plaintiff's intentional infliction of emotional distress claim, is based on the contention that the Plaintiff failed to allege extreme or outrageous conduct on the part of those Defendants, and since the Court has found that the Plaintiff's allegations could support a finding of extreme or outrageous conduct by those Defendants, the Town and Merola's motion for summary judgment on counts 12 and 13 is DENIED.

## IV. CONCLUSION

For the foregoing reasons, the  motion for summary judgment filed by the Defendants Barrett, Augur, and Neubig (**Docs. #75**) is **GRANTED**, and the motion for summary judgment filed by the Defendants Town of North Branford and Merola (**Doc. # 77**) is **GRANTED in part** and **DENIED in part**.

The Court GRANTS summary judgment as to all Counts against the Defendants Barrett, Augur, and Neubig.

The Court GRANTS summary judgment as to all Counts against the Defendants Town of North Branford and Merola except as to Counts 12 and 13. The Court DENIES summary judgment as to Counts 12 and 13. This case will proceed only as to those two Counts, which state claims of intentional infliction of emotional distress against the Town and Merola.

**SO ORDERED** this   7th    day of  December, 2012.


_/s/  DJS_____

DOMINIC J. SQUATRITO
UNITED STATES DISTRICT JUDGE